# CASES

IN THE

# SUPREME JUDICIAL COURT,

OF THE

# STATE OF MAINE.

---

STATE OF MAINE *vs.* ALEXANDER TERRIO.

Somerset.    Opinion July 1, 1903.

*Murder.   New Trial.   Newly-Discovered Evidence.   Expert Testimony.*

The defendant was convicted before the jury of murder in the first degree. He filed a general motion for a new trial before the presiding justice who upon hearing overruled the motion and an appeal was taken to the law court.  Subsequently the defendant filed a further motion for a new trial based on the ground of newly-discovered evidence.

If it be conceded, after a review of the testimony reported upon the general motion for a new trial, that the circumstances and coincidences considered in combination and with relation to the conduct and declarations of the accused, with all the inferences which a jury might justifiably draw from them, would induce an affirmative belief of a strong probability of the defendant's guilt, *held;* that the evidence must still be considered with reference to its negative or exclusive tendency by which it finally establishes the presumption raised by negativing or excluding every other.

Such is the familiar test of the accuracy of a conclusion reached in which the peculiar efficacy of circumstantial evidence consists.

It is not sufficient that the circumstances proved are consistent with and render probable the hypothesis sought to be established, but they must exclude beyond a reasonable doubt every other hypothesis except that one.

*Held;* that under an application of this test, it is not entirely clear that a jury would be required to return a verdict of guilty, without the aid of the expert testimony given at the trial in relation to the marks found upon the primer of the crushed shell and those made by the respondent's rifle.

VOL. XCVIII  2

*Held;* that if the theory presented at the trial by the State's report, was correct, that the characteristic marks made on the primer by the firing-pin of every rifle may be seen under the microscope corresponding with those on the firing-pin, it afforded circumstantial evidence of the certain kind where the fact in dispute is a necessary consequence of the fact attested and could not have been caused by any other.

*Held;* that under all the circumstances the respondent ought not to be deprived of the privilege of having the jury pass upon the newly-discovered evidence tending to modify the force of the expert testimony given at the trial, although it may seem to the court only probable that the new evidence would change the result, or that injustice would be done if a new trial was not granted.

Appeal. Motion for new trial based on newly-discovered evidence. Motion sustained. New trial granted.

The defendant was found guilty of the murder of Mathias Pare March 11, 1901, at or near Misery Stream between Brassua Lake and the Canadian Pacific Railroad, by the jury at the following September term of this court in Somerset County. He filed a motion for a new trial at the same term, which having been heard by the presiding justice was overruled, and he thereupon appealed to the next term of the law court in 1902, where the case was entered and continued until the December term. In the meantime, at the September term of that county, the defendant filed a further motion to have the verdict set aside on the ground of newly-discovered evidence. The evidence introduced in pursuance of this motion was taken out before the justice presiding at that term and is now considered together with the evidence introduced at the trial before the jury.

The facts are stated in the opinion.

*Geo. M. Seiders, Attorney General* and *Geo. W. Gower, County Attorney,* for State.

*D. J. McGillicuddy* and *F. A. Morey,* for defendant.

SITTING: WISWELL, C. J., WHITEHOUSE, STROUT, SAVAGE, PEABODY, SPEAR, JJ.

WHITEHOUSE, J.   At an adjourned session of the September term of the Supreme Judicial Court in Somerset County, in the year 1901, a verdict of guilty was rendered by the jury against the defendant, Alexander Terrio, upon an indictment against him for the murder of

Mathias Pare on the eleventh day of March of that year. Thereupon at the same term of court, the defendant filed a motion to have the verdict set aside as against the evidence, accompanied by a certificate of his counsel that the motion was made in good faith and that the same was necessary for the protection of his rights. This motion was overruled by the court and the defendant appealed from the decision of the presiding justice to the next law court. The case was entered at the next term of the law court in 1902, and continued until the next December term. In the meantime, at the next term of the Supreme Judicial Court for the County of Somerset, in September, 1902, the defendant filed a further motion to have the verdict set aside on the ground of newly-discovered evidence. The evidence introduced in pursuance of this motion was taken out before the justice presiding at that term. The evidence alleged to have been newly-discovered, as well as that introduced at the trial, is now before the court.

On the eleventh day of April, 1901, the dead body of Mathias Pare, a young French Canadian who had for several years been accustomed to work as a woodsman in the forests of Maine during the winter season, was found by the side of a tote road on the banks of Misery Stream between Brassua Lake and the Canadian Pacific Railway, about a mile and a half from Asquith station. The body was fully clothed and nearly covered with brush and snow, but the partial melting of the snow had exposed a portion of the coat and the fingers of one hand. About a rod distant a hat and a woodsman's pack were found. The left pocket of the trousers was torn and turned inside out, and within two or three inches from the end of this pocket a cartridge shell of a 30-30 Winchester rifle was found lying on the snow. It was picked up and placed on the breast of the body where it remained until the body was removed on the fourteenth of April. This cartridge shell exactly fitted the chamber of the respondent's 30-30 Winchester rifle, and by reason of the distinctive marks alleged to have been made by the firing-pin of the rifle upon the primer or cap of the shell at the time the cartridge was exploded, as will be hereafter more fully shown, became evidence of vital importance tending to connect the respondent with the commission of the crime. On

the twelfth day of May following another cartridge shell was found by George I. Peary about fifty feet from the place where the body lay; but it was shown by actual experiment, as the defense confidently asserts, that this cartridge did not fit the Terrio rifle, and hence became of possible significance in behalf of the respondent.

From the subsequent examination of the body made at the autopsy, it appeared that Pare had received a rifle bullet through the chest and another through the right arm. A fragment of a leaden bullet, with a small piece of a steel jacket, was also discovered in a wound in the left arm. The State claimed that all of these wounds might have been made by bullets and steel jackets from a 30-30 rifle. The respondent claimed that the hole through the right arm was larger than the other, and suggested that more than one rifle may have been used. All the bones of the skull were broken and crushed as if by a blow from some heavy instrument like the back of an axe or the butt of a rifle stock. There was also an incised wound on the neck which might have been made with the narrow blade of a pocket knife. At the time the clothing was removed from the body, a metalic case of a bullet from an exploded cartridge and apparently a 30-30 rifle cartridge, dropped out of the clothing.

From the time of these discoveries, it was never in question between the State and the respondent that Mathias Pare came to his death by violence and criminal agency. At the trial the corpus delicti was not in controversy. There was equal moral certainty that he was murdered on the eleventh day of March between the hours of ten and twelve in the forenoon, one month prior to the discovery of the body.

On the banks of Moose River between Brassua and Moosehead Lakes is a primitive settlement known as Rockwood, comprising sixteen houses within the limits of a little more than two miles from Rockwood post office on the shore of Moosehead Lake, including those of George Ritchie, Willie Butler, Felix Butler, Vede Gilblair, the respondent Alexander Terrio, John Raspberry, Fred Parent, Joseph Murray and Sylvere Gaudet. During the winter preceding the murder, Pare had been at work for Gaudet in the woods north of Moose River, and on Saturday morning March 9, he received

from his employer $1.50 in cash and a due-bill for $106.58 in full settlement for his winter's wages. The same day both Gaudet and Pare left the camp in the woods and returned to Gaudet's home at the Rockwood settlement, which was left in charge of George Vigue during the absence of Gaudet and his wife in the woods. Here Pare remained Saturday night. Sunday morning March 10, he went to Kineo, a little more than two miles from Gaudet's and got his due-bill cashed, receiving therefor $100.50 in money, a leather wallet and a quart bottle of whiskey. Returning he arrived at Gaudet's house about half past ten o'clock in the forenoon; and there and at the house of Joseph Murray, with another bottle of whiskey furnished by Murray, he passed the afternoon and evening in drinking and convivial merriment in the company of Joseph Murray, Fred Pooler, George Vigue and Joseph McDonald, Gaudet himself being present at the "early feast" but not at the "late carouse." Several times during both afternoon and evening Pare exhibited his wallet and to some extent exposed his money in the presence of Murray and others. Terrio was not present in this company either in the afternoon or evening, but he was acquainted with Pare, for he worked with him for Gaudet the previous winter of 1900, and he knew that he had just come out of the woods in the Spring of 1901, for he met him in company with George Vigue Sunday afternoon March 10, and exchanged a few words of friendly greeting with him. There is no evidence that Pare in that brief interview made any reference to his wallet, or his money, or his intended departure for Canada the following day. This appears to have been the only time that Terrio saw Pare while he was at Rockwood settlement on Moose River during Saturday, Sunday and Monday before his departure.

Pare spent the remainder of that Sunday night at Gaudet's house in company with George Vigue, and at half past seven o'clock the next morning, March 11, he set out on foot for Asquith station, about seven miles away, carrying a canvas grip or valise and a woodsman's pack, intending to take the train there on his homeward journey to Canada. Between eight and half past eight o'clock he called at the house of Fred Parent and obtained from Mrs. Parent an old envelope in which he placed a portion of his money, leaving the bal-

ance of it in the wallet.   The envelope, with the money in it, he placed inside of his sweater, and the wallet with the rest of the money, he returned to his trousers pocket.   He next called at the house of Willie Butler, another resident on the road to Asquith, and remained there "between half an hour or an hour" until Fred Parent, who was hauling rocks to the Lake, came along with his team and gave him a ride to the "piers."   There he left the team at half past ten or a quarter before eleven o'clock, and continued his journey towards Asquith on foot, taking the shorter road known as the "cookee's path" according to the directions given him by Parent. As far as disclosed by the evidence this was the last that was ever seen of Pare alive.   Nothing further was known or heard in regard to his movements or his fate until his body was discovered on the tote road a mile and a half from his destination at Asquith, except by the person or persons who committed the murder or who were in some way cognizant of it.   It has been noticed that the woodsman's pack was found near the body April 11, but the canvas grip appears to have been picked up near the scene of the crime on the first day of April by Fred Pooler and placed on the team of Wm. Butler, who was moving his goods from Rockwood settlement to Asquith station. It was carried by Butler to the home of George Ritchie of Rockwood, about two and one-half miles from the place of the murder, where Fred Pooler then boarded, the clothing removed from it, and the grip deposited under the bed in Pooler's sleeping room.   After the discovery of the body, Butler notified the sheriff of the finding of the grip.   No money was found in any of the clothing on the body of Pare.   The wallet with its contents had been taken from the trousers pocket and the envelope containing the rest of the money had been abstracted from its hiding place under the sweater.   The murder was obviously committed by some one who had knowledge of Pare's intended journey to Asquith that Monday morning, who knew that he had money on his person, and knew that the amount found in the wallet was not all that he possessed.   The motive for the crime was manifestly robbery.

It is not within the scope and purpose of this opinion to retrace the steps of the government officers throughout the field of investiga-

tion traversed by them in their prompt and active efforts to discover the perpetrator of this crime, or to give a complete statement and critical analysis of all the details of the evidence presented at the trial upon the indictment against the respondent. In the view here taken, the question whether justice to the respondent and due regard for the proper administration of the criminal law require that a new trial be granted in this case must be determined principally by a consideration of the materiality and weight of the newly-discovered evidence relating to the characteristic marks made by the firing-pin of the Terrio rifle upon the primer or cap of the cartridge shell found by the side of Pare's body and afterwards designated the "crushed" shell. The relevancy and importance of this newly-discovered evidence may be fully understood and appreciated by a simple statement of the respective theories and contentions of the State and the respondent, an explanation of the expert testimony of Prof. Whittier introduced at the trial in regard to the imprint upon the primer of the crushed shell, the material portions of the newly-discovered evidence of Prof. Knight, and a brief summary of the less conclusive circumstantial evidence presented by the State, with the leading exculpatory facts adduced in behalf of the respondent.

Recognizing the obvious motive of the crime and the fact that it was unquestionably committed by some one having knowledge of the victim's money and intended journey, the government officers sought by the process of exclusion to narrow the field of inquiry and to ascertain, in the first place, whether all of Pare's merry companions of Sunday afternoon and evening March 10, who saw his wallet and knew it contained substantially his winter's wages, could satisfactorily explain their whereabouts and movements on Monday forenoon March 11. One of them who became prominent in the investigation, acting as guide for the sheriff, was Joseph Murray, a young woodsman 28 years of age, who had a camp on the west shore of Brassua Lake, six miles from his home at Rockwood. He was interviewed by the sheriff on the fifteenth of April, two days before the arrest of the respondent, and testified at the preliminary hearing and at the trial before the jury.

*Proximity to the Scene of the Murder.* According to his testimony, Murray himself left his home Monday morning March 11, between seven and eight o'clock, to visit his camp across the Lake, and as he was walking on his trail through the woods, he discovered fresh snow-shoe tracks coming from the north, and entering and following his trail westward to the Lake. On reaching the Lake these tracks diverged southerly from Murray's trail with a general trend in the direction of the place where the body of Pare was found. Murray claims, that although it was snowing that forenoon, he noticed at the time that one of these tracks was smaller than the other; "one shorter than the other and one some wider than the other," as he "had seen them before quite a few times." He had seen Terrio's snow-shoes a dozen times, and knew that one of them was shorter than the other. He had walked with Terrio and noticed that he "walked with a short step and rather wide at that." The following Wednesday he went out over his trail again and recognized the same tracks at another point returning in a northerly direction, although five inches of snow had fallen then. When Terrio's snow-shoes, one of which was in fact about two inches longer and a little narrower than the other, were exhibited to him at the trial, he asserts without qualification that they were the snow-shoes that made the tracks seen by him at both places. On cross-examination, however, he admits that he cannot be positive that the returning tracks he saw on Wednesday were the same as those seen on Monday, "because they were filled with snow." He states that the purpose of his visit to his camp that day was to obtain some fish, previously caught, for his brother-in-law, Joseph McDonald, who was visiting him and in fact remained with him until the following Wednesday. He had with him that day a 22 Flobert rifle.

It is contended in behalf of the respondent that this story of Murray's movements that Monday forenoon is wholly uncorroborated by any witness, and that nearly every feature of it is so extraordinary that Murray himself has even been subjected to suspicion of complicity in the crime. It is deemed to be unreasonable that he should make a journey of twelve miles on a stormy day to obtain a few fish for his brother-in-law, and that although he claims to have left home

about the same time that Pare left, and must have passed ten of the houses in the Rockwood settlement, there is no evidence that any one saw him until he and Simeon Newton appeared at the house of Felix Butler on his return between 12.30 and one o'clock. He was in the habit of making frequent visits to his camp across the Lake, and as the use of snow-shoes was common in that region, it is claimed to be wholly improbable that, upon such casual observation as he would be likely to give to snow-shoe tracks, on that Monday forenoon, he would have noticed that one was a little longer than the other, and be able to identify them as the tracks made by Terrio's snow-shoes; or that after the lapse of thirty-one days, he could remember the precise day on which he saw these particular tracks. There is a plain intimation in his testimony that it occurred to him at the time that those were tracks made by Terrio's shoes, and yet it is not in evidence that he ever mentioned that fact at Felix Butler's that day or to any one else at any time prior to the discovery of Pare's body. There was evidence in behalf of the defense that Murray had shown a feeling of ill-will against Terrio and made some threats against him. It also appeared that although Murray and Simeon Newton unquestionably met at Felix Butler's that Monday, Murray afterward claimed that he never saw Newton until the following September.

But Murray further states that on the seventeenth of April, the respondent Terrio, after his arrest, was left in his charge by the officers at Moosehead Lake for a few minutes, and after some conversation Terrio stopped talking a minute or two and then said: "Joe, the way the sheriffs are talking, you must have saw me that day," Murray's reply was: "No sir, I didn't." It appears that Murray never disclosed this statement imputed to Terrio in any of the interviews with the officers prior to the preliminary hearing; and made no mention of it in his testimony at that hearing; and it is insisted in behalf of the defense that a statement of such marked significance, practically tantamount to a confession of guilt, must have made such an impression upon the mind of Murray that he could not have failed to recall it and inform the offcers of it before the preliminary hearing, if it was in fact uttered as he now claims.

It is not in controversy that Murray called at the house of Felix Butler at Rockwood about one o'clock on that Monday, March 11, and there met Simeon Newton, who gave testimony of still more striking importance to the State tending to show the respondent's proximity, in point of time and space to the scene of the murder. It is claimed in behalf of the defense, however, that the testimony of this witness invites the careful scrutiny of the court, not only because he admits that after the arrest of Terrio, he left the State and wandered about in New Hampshire and Massachusetts in order to avoid being called as a witness, but also because of the inherent improbabilities in the testimony itself.

Simeon F. Newton was another woodsman, thirty-eight years of age, residing at Jackman, but having business and social relations with the residents of Rockwood on the lower Moose River. Saturday night and Sunday, March 9 and 10, he was at Martin Munster's near Asquith station "sporting and having a good time." He left Munster's Monday forenoon about half past ten o'clock, after an early dinner, and taking the Misery tote road, started for John Holden's at Moosehead Lake. When he reached the thick woods near the burnt land, where he afterwards learned Pare's body was found, he says he noticed that the tote road was "all tracked up with snow-shoes," and about ten or twelve rods below he saw the same tracks crossing the tote road again. He noticed that the track made by one of the snow-shoes was larger than the other. He further states that he saw blood in the road at that point. On the left hand side of the road, about ten or twelve feet from the road, he discovered a valise or grip, and ten or twelve rods distant, he saw a man on snow-shoes with a rifle on his shoulder, going into the woods out of sight "as fast as he could travel." The man was back towards him and going in the direction of Brassua Lake. At that time he had never seen Terrio to know him, but on the 13th of April following, when Newton was employed as cook in Holden's camp on the Sockattin drive, Terrio, who was also employed by Holden, was sent from the farm to the camp with the mail to be delivered to Newton for the crew. Newton says he recognized him at once as the man he saw hastening into the woods from the scene

of the murder, on the eleventh day of March preceding. Although Terrio was then on snow-shoes and he only saw his back 10 or 12 rods distant in a snow storm, and he was not on snow-shoes when he came into camp April 13, Newton testifies that he recognized him by his "gait, his walk and his form."

On Monday the eleventh, as already noticed, Newton reached Felix Butler's about one o'clock and there met Joseph Murray, but neither appears to have mentioned to the other or to Butler what he had seen that day. Early in September following, however, Newton did say to Felix Butler, according to the latter's testimony, that he saw nothing on the tote road that Monday forenoon the eleventh of March, except a grip and some blood. He made no mention then of the fact that he saw a man disappearing in the woods, whom he afterwards recognized as Terrio. Two witnesses for the defense state that they rode from Rockwood to Asquith that day on a sled with one horse and as the horse was walking slowly along the tote road, where Pare's body was afterwards found, they saw blood in the road, and something outside of the road covered with boughs and received the impression that some one had killed a deer and attempted to conceal it. They saw moccasin tracks near there, but say that there were no snow-shoe tracks whatever in that vicinity. Again, if Newton was at the scene of the murder so early as to detect the criminal in the act of escaping, he must have been so near when the fatal shots were fired that he would have heard the reports of the rifle. But there is no evidence that any such reports were heard by him.

It is insisted in behalf of the defense that the testimony of Simeon Newton is wholly unworthy of credence. Though his sense of duty to the public was so obtuse that at first he fled from the State rather than disclose potent facts within his knowledge which might bring to justice the perpetrator of an atrocious crime, his testimony at the trial affords no indication of unwillingness on his part to aid in the conviction of Terrio by means of an identification that is manifestly uncertain and unreliable. It is claimed that his conduct was so strange and his testimony so remarkable that he too has subjected himself to the suspicion of having more information than he has

disclosed in relation to this crime.   For it is undoubtedly a general rule often confirmed by observation of merely culpable as well as criminal conduct in life, that it is a sense of delinquency and guilt and not conscious innocence that shuns investigation and seeks concealment.

*Conduct and Declaration of the Accused.   Alibi.*   On the other hand several important declarations made by the accused after his arrest are so completely overborne by other testimony, or are so highly improbable in themselves, that they have strong criminative significance against him.

In his written statement to the sheriff Terrio says he remembers that on that Monday morning after he saw Pare Sunday night, he went into the woods to cut wood about half-past seven or eight o'clock, worked until noon and then came out to the house to eat his dinner.   It stormed so hard in the afternoon that he stayed in the house and laid a chamber floor.

But John Calder called at Terrio's house about one o'clock that day to warm a dish of tea on the stove and saw Mrs. Terrio and the children at the dinner table, but did not see Terrio himself there. Fred Dube met him at the water-hole on the ice in front of his house between four and half-past four that afternoon, and Terrio then said that he had been gone all day and just come home.   In her testimony, Mrs. Terrio had stated that her husband went into the woods to cut wood that forenoon without taking his rifle with him, and returned at one o'clock.   In the afternoon he laid a chamber floor.   But her testimony was impeached by her statement to officer Haskell that her husband did not come home to dinner that day, but returned about five o'clock, and her further remark to Angie Parent that her husband took·his dinner with him that day because it was stormy.   There was also evidence that the chamber floor was laid at another time.   An alibi is the instinctive and favorite resort of conscious guilt as well as the natural defense of innocence; but an unsuccessful attempt to establish it is necessarily highly prejudicial to the accused, for ·the obvious reason that such a defense implies an admission of the truth of the facts alleged against him,

and the correctness of the inference drawn from them, if they remain uncontradicted.

In the same written statement to the sheriff Terrio says that about three o'clock that afternoon he loaned his snow-shoes to a "light-complected" young man wearing a red frock, whom he never saw before and has never seen since. The young man said he wanted them to go to Kineo and promised to return them the next morning, but failed to do so. A week later, however, he found them sticking in a snow bank about twenty rods above his house. Two witnesses for the defense testify that they saw the snow-shoes there on the snow bank about that time. This labored suggestion in regard to the loan of the snow-shoes to a stranger would seem to have been inspired by the hope of accounting for the snow-shoe tracks seen by Murray and Newton, without Terrio's personal presence; but inasmuch as he states in his testimony that he is not sure whether the loan was made on the 11th or 12th of March, and in any event it did not occur until three o'clock in the afternoon, it obviously fails of its purpose and whatever importance it does possess is prejudicial to the accused.

*Fruits of the Crime. The Money.* The recent possession of the fruits of crime involving larceny and robbery, in the absence of a satisfactory explanation, raises a natural presumption of fact that the person in whose possession they are found is the perpetrator of the crime. But the strength of this presumption obviously depends in a great degree upon the nature of the property in question, the time within which the possession is shown and various other conditions which give occasion for the application of the rule. In the case of bank bills which readily pass as currency from hand to hand, and which are not specially identified as the fruits of the crime, the presumption may be very weak or there may be none at all. But even in such a case, a sudden change in the life and circumstances of the accused immediately after the crime, followed by inconsistent and improbable explanations of the change, may equally justify an inference of guilt.

In the case at bar the State attaches great importance to the evidence tending to show that while for several months before the murder Terrio's earnings had been small and his money insufficient

to pay debts then due, immediately afterwards, he paid out considerable sums, which with the amount found in his house by the officer, after deducting the cash known to have been received by him in the meantime, made an amount substantially equal to that which Pare had when he left the settlement March 11. It is not in controversy that on the fifth day of April, Terrio paid $47.50 to Octave Clair to take up one of the notes given for one-half of the Raspberry farm, and that his wife delivered to officer Haskell $45.00 at the house, taking $43.00 of it in bills out of the sewing-machine drawer, including a torn bill which Terrio said he obtained at Kineo. Terrio had previously told the officer, however, that he had this money in the house. About the same time he paid to other parties sums amounting to $14.50. In November preceding he borrowed the money to pay the $25.00 note given for the Raspberry farm, and made an effort before that time to hire a larger sum. In March, 1900, he contracted to pay $170.00 for one-half of the Raspberry farm, and paid $50.00 down.

In accounting for his recent expenditures Terrio claims that he had $400.00 in money and a $200.00 note when he left Madison two years and a half before, and that after he settled in Rockwood, he buried $250.00 in his cellar enclosed in a salt box for safe keeping. He never received but five dollars as interest on the $200.00 note and lost the principal. He stated first that the $43.00 of bills which his wife took from the sewing-machine and gave to the officer were a part of the money buried there, and that he took out $100.00 that Spring to pay his bills. At his request his former counsel went to his house at Rockwood and made diligent search for the money alleged to be buried in the cellar, by digging according to his directions, but no money or traces of a hiding place could be found. In explanation of the fact that he paid only $50.00 down for the Raspberry place, when he had money enough to pay the entire $170.00, he says that Raspberry did not want the money, but preferred notes without interest for all above $50.00. When officer Haskell informed him that they were well satisfied that the five and ten dollar bills, which made the $43.00, taken from the sewing-machine drawer, came from Kineo, he became excited, threw up one of his hands and

exclaimed "My God, I was afraid—I thought—" and then broke down and wept. A few minutes later he said he had no doubt about it and explained that a stranger came along and exchanged the five and tens for a fifty dollar bill which he had. Terrio afterward claimed that this stranger was Joseph Murray. This is denied by Murray. It appeared from the statement of Mrs. Terrio in rebuttal that her husband told her he received the $43.00 in the sewing-machine drawer from the $200.00 note. But it is unnecessary to bring under discussion the great mass of details introduced in evidence in regard to all of Terrio's business affairs before and after the murder of Pare. It is insisted in his behalf that the evidence discloses sufficient funds in his possession to account for all his expenditures without the use of Pare's money; but with reasonable charity for the primitive habits of life and simple methods in business peculiar to the unlettered woodsman, it must be admitted that his explanations are so contradictory, extraordinary and improbable as to justify an inference unfavorable to the theory of his innocence.

One other declaration the State deems significant. In a conversation at Kineo, officer Haskell said: "Aleck, where is that envelope?" He says, "What envelope?" I said, "The envelope that had the money in it." He thought a minute and he says, "I think I stuck it up in the crack by the window in the house." At that time no envelope had been mentioned in connection with the case except that in which Pare concealed a part of his money under his sweater. But as Terrio had shown no disposition to confess his guilt, it seems a forced suggestion that having "thought a minute" he made such an answer, understanding that the question had reference to the Pare envelope. It seems but just to suppose that he was thinking of some other envelope.

The antecedent threats alleged to have been made by Terrio against Pare do not seem entitled to weighty consideration.

If it be conceded that the foregoing circumstances and coincidences, considered in combination, and with relation to the conduct and declarations of the accused, with all the inferences which a jury might justifiably draw from them, would induce an affirmative belief of a strong probability of guilt, the evidence must still be considered with

reference to its negative or exclusive tendency, by which it finally establishes the presumption raised by negativing or excluding every other. This is the familiar test of the accuracy of a conclusion reached in which the peculiar efficacy of circumstantial evidence is believed to consist. It is not sufficient that the circumstances proved are consistent with and render probable the hypothesis sought to be established, but they must exclude beyond a reasonable doubt every other hypothesis except that one. Under an application of this test to the evidence above noticed, it is not entirely clear that a jury would be required to return a verdict of guilty upon it. The importance, therefore, of the expert testimony relating to the marks upon the primer of the cartridge made by Terrio's rifle can now be fully realized.

*Characteristic marks on the primer. Expert testimony.* After it had been demonstrated by actual experiments made successively by the County Attorney, and two officers, that the shell of the 30-30 rifle cartridge found by the side of Pare's body exactly fitted the Terrio rifle, the shell was accidently crushed in a letter press by the County Attorney, and was thereafterward known in the case as the crushed shell. Observing the indentation made by the firing-pin, on the primer of this shell, it occurred to the mind of County Attorney Gower, that the firing-pin of every rifle might be found under the microscope to possess such an individuality that its characteristic marks would be impressed on every primer exploded by it, and that the marks on the primer might also be seen under the microscope corresponding with those on the firing-pin. If so, it would afford circumstantial evidence of the certain kind where the fact in dispute is a necessary consequence of the fact attested and could not have been caused by any other. The crushed shell, the Peary shell, the Terrio rifle and six other 30-30 rifles were accordingly sent to Dr. Frank N. Whittier, professor of bacteriology in Bowdoin College, and an expert in the use of the microscope, who made a critical examination of the primer of the crushed shell, the Peary shell, and of several other shells, and of the firing-pin of the Terrio rifle and of six other 30-30 rifles, by the test of the microscope, and photographs of microscopical views, magnified 25 diameters or 625 times. Called

as an expert in microscopy, he testified in regard to the crushed shell and the firing-pin of the Terrio rifle as follows:

"The first thing that I noticed in examining this shell under the microscope was a very prominent circle or ring, at the very center of this depression. That cannot be seen at all with the naked eye. Inside this ring I saw an L-shaped figure, a figure that, viewed under the microscope, seemed very plain. Then, at one end of the · L-shaped figure, I saw a figure that somewhat resembled a claw, and that, in speaking of it, I would like to call a claw-shaped figure. Both of these figures, the L-shaped figure and the claw-shaped figure were inside the ring that I spoke of a moment ago. All these things were microscopic. They were so small that they could not be seen with the naked eye. Just outside the ring was a star-shaped figure, a figure that resembled somewhat a star. That also was so small that one could not see it at all with the naked eye. Outside this comparatively large and prominent ring—of course .it is really very small indeed—but outside of this central ring I have been speaking of was a number of other rings. I could make out, in places at least, nine other rings, one outside of the other. I could also make out certain lines, ridges and grooves, amounting to at least twenty, little ridges, depressions or rings, that were on the surface of this little depression; but the most prominent things that I could see were the four things that I have mentioned, the central ring, the L-shaped figure, the claw-shaped figure and the star-shaped figure."

"I examined the firing-pin on the same day that I examined the shell, that is, under the microscope, and I found appearances which corresponded exactly to the appearances on the shell, with the exception that everything was reverse as regards right and left.  .  .  .  . I found an L-shaped figure with the angle turning in the opposite direction from the L-shaped figure on the primer.  .  .  . The L-shaped figure was a ridge on the primer, and a depression on the firing-pin. I found there two things: The L-shaped figure and the claw-shaped figure inside of a central circle which corresponded to the central circle of the primer. The central circle containing these in the firing-pin corresponded to the central circle of the primer, except that the circle was a ridge on the firing-pin; it was a depression on

the primer. I found the star-shaped figure outside this central circle."

Dr. Whittier discharged a cartridge in the Terrio rifle, and made a photograph of the primer of that shell. It shows the same prominent markings that are shown by the photographs of the crushed shell. He examined under the microscope the firing-pins of other 30-30 rifles, but found no marks upon them corresponding with the marks found upon the firing-pin of the Terrio rifle. He also discharged cartridges from the other rifles, and examined the primers of those shells under the microscope, but found no marks upon them corresponding with the marks upon the primer of the Terrio shells; but in every case the mark on the primer of the shell corresponded with the mark on the firing-pin of the rifle that discharged that shell, with the difference that the right was left; and prominences were represented by depressions. In no instance did the markings upon the primer of a shell discharged in one rifle correspond with the markings on the primer of the shell discharged in any other rifle; and no two firing-pins could be found that were identical.

In regard to the Peary shell, found on the eleventh of May, about fifty feet from the place where Pare's body lay, Dr. Whittier says he was unable to determine whether it was fired in the Terrio rifle or not, by reason of the erosion or rusting that had taken place. The photograph of the microscopic view of the primer of that shell discloses no marks similar to those on the primer of the crushed shell. Dr. Whittier also explained the use of the micrometer, or measuring scale used by him, which makes actual measurements of any microscopic object in thousandths of an inch. By means of this instrument he measured the ridges and depressions constituting the markings on the primer of the crushed shell and found that they corresponded exactly with the measurements made upon the firing-pin of the Terrio rifle.

The respondent was unprepared to meet this novel and interesting phase of the State's evidence, and could only present the negative results of other hasty and imperfect examinations which failed to disclose these characteristic marks on primer and firing-pin. The evidence thus went to the jury with substantially the full effect claimed

for it by the State; and in view of the fact that Terrio's rifle was admitted to have been in his own possession on that eleventh of March, the testimony of Dr. Whittier, corroborated by the photographs exhibited in evidence, unquestionably exerted great probative force on the minds of the jury; and when this was combined with all the other facts and coincidences in the case, it may be conceded that the State's evidence warranted the verdict of guilty rendered by the jury.

But upon the motion for a new trial on the ground of newly-discovered evidence Prof. O. W. Knight, State assayer and expert microscopist, was authorized by the court to make a careful and exhaustive study of the question for the purpose of testing the accuracy of Prof. Whittier's conclusions. Prof. Knight thereupon made a thorough examination, under the microscope, of the crushed shell and of the end of the firing-pin of the Terrio rifle; and finally by the aid of photographs, he was able to find all of the markings on the primer of the shell and on the firing-pin, as described by Dr. Whittier. He thus verified the conclusions of Dr. Whittier, that there were characteristic marks on the end of the firing-pin of the Terrio rifle which made a corresponding imprint upon the primer of every cartridge discharged in it and that the marks on the primer of the crushed shell corresponded with the marks on the Terrio firing-pin.

But it will be remembered that Dr. Whittier testified, in effect, that he was unable to distinguish any characteristic marks on the primer of the Peary shell on account of the corrosion that had taken place. Prof. Knight thereupon undertook a series of experiments, which Prof. Whittier had not attempted, for the purpose of determining to what extent this corrosion would take place under given conditions, and whether such inconceivably fine and delicate marks as those in question, which could be seen only by the aid of a powerful microscope, might not under some conditions, disappear altogether in a short space of time under the effect of corrosion. In relation to these experiments Prof. Knight testified inter alia as follows: "On the 2nd day of March, 1902, I fired a number of shells in a rifle hired for the occasion. One of these shells I sealed in a glass tube so that it would show its original condition and would

not be acted upon by the atmosphere in any way. I then exposed a number of shells in various localities where they would be exposed to the rain and snow and the inclemencies of the weather. On the 9th of the same month, I took three of these shells home and after drying them thoroughly put them in this sealed tube. After this exposure of one week, I found that considerable corrosion had taken place on the external surface of those shells, so much so as to be visible to the naked eye. March 16, I took home and dried three more of these shells, and found they were still more corroded, and the condition is noticeable to the eye unaided by the microscope. My next step was to fire a number of shells in the Terrio rifle March 29, 1902, in the presence of Dr. Whittier. After sealing one in a glass tube so that it should remain unaltered and untarnished, April 3, I exposed six of these shells in a snow bank in a shady locality, about a mile from the city of Bangor, selecting a locality as nearly as I could like that in which the body was found. The same day I exposed six other shells in a sunny place in a snow bank. I · took photographs of the microscopic views of those placed in a snow bank in a sunny locality and three of those in a shady locality. I took the photographs April 1, April 20, and again on May 3. I would like to add that I took pains to select for this entire experiment shells which showed most distinctly the characteristic marks of the Terrio firing-pin. I took measurements of the markings of these six shells, and also of the crushed shell. From the lowest depression of the bottom loop of the L to the tip of the highest ridge, the measurements of the six shells were respectively .0013125 of an inch, .0013125, .0015000, .0013125, .0015000, and .0018750 of an inch. The measurement of the markings on the crushed shell was only .0010382."

"I will now state the different stages of the corrosion of the face of the primer of the six shells exposed in the snow from April 3 to May 3. Examined under the microscope April 13, the markings upon the primer had begun to disappear somewhat and were much less sharp at the edges than they were April 3. April 20, the markings were very faint, far fainter than the markings of the crushed shell, and the photographs taken there are included in the exhibits.

On May 3, after being exposed one month, by examination with a microscope and by taking the photographs, I was unable to find on any of these shells markings which would lead one to conclude that they could possibly have been fired in the Terrio rifle. In the course of the work, I have examined the firing-pin of the Terrio rifle and many other rifle pins of similar make and as a result of my experiments, I am forced to conclude that it would be impossible for a shell to be exposed for thirty days and retain the characteristic markings made on the primer by the firing-pin of any rifle which I have examined in the course of my work. If the crushed shell in this case was used in committing this murder on the 11th day of March, 1901, and had remained in the conditions which the evidence in this case which I have read shows it to have been near Pare's body, and remained there until the 11th day of April, following, in my opinion, it would not have borne the marks of any firing-pin of any rifle in which it was fired on the 11th day of March."

After explaining the several causes which might tend to induce corrosion, Prof. Knight further testified that he should expect to find a deeper impression on a shell that was fired in a rifle and exploded than he would if the empty shell was afterward put into the same rifle barrel and hit with the firing-pin under the blow of the rifle hammer. "When the shell was loaded, and put into the rifle, the firing-pin coming down on it would exert a force tending to depress the primer; almost at the same instant the explosion of the material within the shell would exert a force in the opposite direction, and between these two forces the soft metal composing the primer would be forced into the pores of the firing-pin. In the second case a shell, when it had already been exploded, when it were put into a rifle and the firing-pin dropped on it, there would be only the one force, the force of the spring of the firing-pin acting and the impression would not be so deep, because there would be nothing to force this soft metal into the pores of the firing-pin."

In this connection the figures of the measurements showing smaller "depressions and ridges" in the marks on the primer of the crushed shell than on the primer of the other shells have possible significance. It is asserted with confidence, in behalf of the defense, that these

facts in connection with the evidence relating to the effect of corrosion satisfactorily prove that the characteristic marks on the primer of the crushed shell were not made when the loaded cartridge was exploded on the 11th of March, but accidentally made on the empty shell at a much later date, when this shell and Terrio's rifle were freely manipulated for the sole purpose of ascertaining whether the shell fitted the chamber of the rifle. This was before the shell was crushed and before the theory of characteristic marks had been suggested. It is pertinent to remember, however, that if the crushed shell was not exploded in the Terrio rifle on March 11, it was undoubtedly exploded in some other rifle on that day and received a characteristic imprint from the firing-pin of that other rifle. Unless obliterated by corrosion there was therefore already the impression of one firing-pin on the primer of the crushed shell, before it could accidentally have received a second impression after it was empty. Whether this is a factor of sufficient materiality to complicate the problem is a question which does not appear to have been considered by the experts. Dr. Whittier's testimony, however, only goes to the extent of asserting that the four prominent markings described by him were the same on the primer of the crushed shell as on the primers of the other shells exploded in the Terrio rifle. It is possible that these four characteristic marks might be impressed on the primer of the crushed shell after the first imprint, made by another rifle, had disappeared under the influence of corrosion, while the other infinitesimal shadings on the crushed shell alluded to by Dr. Whittier, might have a different appearance from those on the other shells.

Prof. Whittier was not called to rebut or controvert this evidence of Prof. Knight, and if it had been presented at the trial in connection with the evidence of Dr. Whittier, it is not improbable that it would have raised in the minds of the jury a reasonable doubt whether the characteristic marks on the primer of the crushed shell were made by the Terrio rifle at the time the cartridge was exploded on the 11th of March, or accidentally made on the empty shell at a subsequent date; and if they had a reasonable doubt respecting that proposition, it is not improbable that they would have had a reasonable doubt in relation to the guilt of the accused and returned a differ-

ent verdict. Under all the circumstances it seems but just that the respondent should not be "deprived of the privilege of having his new evidence passed upon by a jury whose peculiar province it is to decide controverted issues of fact, even though it appears to the court only probable that the new evidence would change the result, or that injustice would be done if a new trial was not granted." *Parsons* v. *Lewiston, etc., Street Railway*, 96 Maine, 508. The respondent is an unknown woodsman whose personal destiny may attract little attention and awaken little interest; but equally with all others he is entitled to the protection of the courts. The discovery of truth is the single aim of all judicial inquiry, and justice should always move to its end with deliberation and with the strength and dignity of impartial law.

With respect to the motion for a new trial based on newly-discovered evidence the entry must accordingly be,

>*Appeal sustained; Motion sustained; Verdict set*
>*aside. New trial granted.*