STATE OF MAINE *vs.* ALEXANDER CLOUTIER.

York.      Opinion, July 31, 1936.

*Clyde R. Chapman,* Attorney General,
*Robert B. Seidel,* County Attorney, for the State.
*Richard H. Armstrong,*
*Simon Spill,*
*Hiram Willard,* for the respondent.

SITTING: DUNN, C. J., STURGIS, BARNES, THAXTER, HUDSON, MANSER, JJ.

THAXTER, J. The respondent, indicted by the Grand Jury for the County of York for the murder of Florence Grenier, pleaded not guilty, was tried and convicted. During the course of the trial

numerous exceptions were taken to the admission and to the exclusion of evidence, to the refusal of the presiding Justice to give certain requested instructions; and, after the verdict, a motion for a new trial was addressed to the presiding Justice, which was denied. The case is now before this Court on the exceptions and on an appeal from the ruling denying the motion for a new trial.

## THE APPEAL

Florence Grenier, a girl seventeen years old, left her home in Williams Court, Biddeford, sometime between quarter and half past nine on Tuesday morning, August 20th, 1935. She passed from Center Street to Elm Street, walked easterly on Elm to Cutts Street, was observed proceeding southwesterly on Cutts Street, and was last seen about half past nine in front of the Buick & Olds Service Station at the corner of Elm and Cutts Streets, passing in the rear of a parked automobile which was identified as one belonging to John Cloutier, the father of the respondent. She did not return to her home and an intensive search was begun. She had been a friend of the Cloutier family, and the evidence clearly establishes that the respondent had shown her considerable attention. They had been automobiling together, to the moving pictures, and he had frequently come to the house for her. Cloutier had spoken to Irene Grenier of his affection for her sister, Florence, and had asked her to put in a good word for him.

Believing that Florence had entered the Cloutier car on the morning of her disappearance and had been driven off by the respondent, the Biddeford police placed him under arrest and questioned him as to her whereabouts. He denied even knowing this girl to whom he had been paying such close attention; he claimed that he had never ridden with her in an automobile; he refused to recognize her picture; at first he could not remember where he was the morning of her disappearance, and then claimed that he was at the mill at Alfred all day where his father worked. Finally, becoming very much distraught, he said: "I am going to tell you." At this time an interruption came when the telephone bell in the office rang; and when the interrogation was resumed, the respondent had recovered his composure and refused to divulge anything. There is no evidence whatsoever that there was any abuse of the prisoner at this

time. In fact he was carefully informed of his rights. On Friday morning there was further questioning under similar conditions. His reply was: "I will die before I talk."

Though it is.true that sometimes those accused of crime, even though innocent, may through fear attempt to divert suspicion from themselves by false statements, yet such is not the usual conduct of innocent men. The statements of Cloutier in this instance are particularly significant, because, at the time when they were made, there was no charge of murder. The authorities were attempting to find a missing girl, one who had apparently been the sweetheart of the man, who, at the time of the search, denied ever having known her. His sudden lack of interest in her whereabouts, his failure to co-operate with those who were straining every energy to locate her, his disregard of her family with whom he had been on terms of intimate friendship, all cast the shadow of suspicion toward him. Alone, of all people in that community, he seemed to have no concern about her. To the agonized inquiries of relatives and friends, his reply was: "I do not know the girl."

On Friday morning, three days after her disappearance, the body of Florence Grenier was found in a dump in the town of Lyman about three hundred feet from the main highway leading from Biddeford to Alfred. It was partially covered with boxes, branches and rubbish. Under the head, soaked with blood, was a small pillow similar to those used as a back rest in chairs or automobiles. The condition of the body indicated beyond question that the girl had come to her death by violence. Her clothing was drenched with blood; there was a deep cut on her forehead apparently made by some blunt instrument; there was a compound fracture of the skull extending from the base of the nose to the top of the head and from there to the back of the left ear; the lower jaw was fractured and the chin pushed back into the mouth. With the exception of slight bruises, there were no marks of any kind on the body. The nature of the injuries indicated that her face and head had been beaten with some blunt instrument. It was without question an incredibly brutal murder.

Cloutier's whereabouts in the early morning of August 20th, the day of her disappearance, seem to be fairly well established. He left his home in Biddeford in the family automobile and drove his father

and his brother, Noe, to the Shepard Morse sawmill at Alfred where they worked, a distance of approximately twelve miles. They arrived there about quarter past six. William R. Berry, who lived about a mile from Alfred on the Biddeford road, testifies that sometime between seven and eight in the morning, the respondent stopped at his house and wanted to borrow fifty cents with which to buy some gasoline. Instead of giving him the money, Berry gave him some gas. The respondent at this time was neatly dressed in blue pants and a light shirt. Arthur Boulay, who was employed at the Staples Service Station on Franklin Street in Biddeford, testifies that Cloutier stopped at his station about eight o'clock and bought gasoline. The time is fixed very definitely, for a charge slip was offered in evidence and Boulay states that the sale to the respondent was made about half or three-quarters of an hour after a sale to a man named Greenier, who called at the station at half past seven every morning. According to the testimony of Mederic Lebel, who was employed in the service station at the corner of Elm and Cutts Streets, the respondent next appears there about half past nine. He parked his car in the street, walked to the station, and talked to Lebel. He was cleanly dressed and his hair was neatly combed. He said that he was waiting for some one. Looking outside, and apparently seeing the person whom he was expecting, he left and got into his car, leaving the right-hand door open. Lebel saw a girl, whom he recognized as Florence Grenier, cross the street and walk in back of the car. He heard the door close and saw the car drive off. These details fit in with the testimony of Romeo Gagne and Blanche Bastille who testify that they saw the girl coming down Cutts Street about a quarter or half past nine. The testimony of Everett McLeod, who worked at the mill, is significant in this connection. He saw the respondent at the mill between seven and eight in the morning, and thereafter until after dinner he did not see him, nor was the Cloutier car in its usual parking place.

From this testimony the jury was warranted in finding that Cloutier drove his father and brother to the mill at Alfred early in the morning; that he left there sometime between seven and eight and drove first to Mr. Berry's, then to the Staples Service Station in Biddeford, and finally arrived at the corner of Cutts and Elm

Streets where he was expecting to meet Florence Grenier; that he did meet her there about half past nine; that she entered his car; that they drove off; and that she was never seen again alive.

His own story of his movements is confused, at some points at variance with established facts, uncorroborated except by members of his family, evasive, and altogether improbable. He admits driving back to Biddeford to buy tires, but claims that after leaving the Staples Service Station, where he talked with Boulay, he drove back to Alfred. There, he says, he went to see a man by the name of Jones, who worked at the mill packing shavings. Jones, however, did not appear at the trial. Then he drove to Springvale to look at a steam engine. Just what his purpose was in so doing is not explained, except that his father had an interest in the engine. He then spent the rest of the morning at the mill in Alfred. His father says that he saw him about the mill during the morning. Neither the respondent's testimony nor that of his family carries conviction. It is inconsistent with their previous testimony and with their earlier statements. It is highly significant that the respondent himself does not recall his visit to the service station where Lebel says he talked with him for it was here that the murdered girl was last seen alive.

Under the head of Florence Grenier, as she lay in her shallow grave, was found a cushion. It was certainly not by chance that her head happened to fall on that. Just what may have been passing through the mind of her murderer, as he laid her battered features on that pillow, we can only guess. Boulay testifies that he saw such a cushion in the Cloutier car when the respondent stopped at his filling station for gas, and that he moved it to one side in the front seat when he got in at Cloutier's suggestion to try the car. Jeanette Bill, who had ridden in the car and had been a visitor at the Cloutier house, testifies that she had seen this cushion in the car and at the house. Archille Angers, who operated a truck and had moved the Cloutier family, testifies that such a cushion was among the furnishings of the Cloutier family and that he had used it in moving to place between articles of furniture to protect them. As against all this, Cloutier claims that there never was any cushion in the car. His brother, Noe, says the same thing. Others state that they never

saw the cushion in the house or in the car. Some possible bias against the family was indicated by Jeanette Bill, but the statements of Boulay and Angers seem impartial and convincing.

It is conceded that sometime shortly after noon the respondent was at the mill. Everett McLeod saw him sitting in his car after dinner. During the early part of the afternoon, the automobile mysteriously caught fire. Cloutier in his testimony offers no explanation of the cause of the fire. He claims to have first seen from the mill smoke coming from the car. McLeod, however, who helped put the fire out, says that Cloutier told him it was caused by a cigarette. Of real significance, however, is the statement of McLeod that, when he was helping to extinguish the blaze, which seems to have been confined wholly to the upholstery, neither the cushion for the back seat, nor the back cushion was in the car. These were both there at the time Boulay examined it in the morning; and it is, therefore, clear that between then and the time of the fire they had been removed. Certainly, after the fire broke out, there was no opportunity for Cloutier to have disposed of them. The cushions disappeared, and the only explanation offered is that of Mederic Cloutier, a brother, who says that he threw them on a fire in the dump Tuesday night. The remains of them were, however, never found there. After the fire had been extinguished, the respondent spent about two hours cleaning the automobile, and that night after it was brought home, John Cloutier, the father, washed it again. Had Florence Grenier been beaten to death in that automobile that morning, the telltale marks of blood, which must have drenched the back cushions, disappeared when the cushions were removed; and spattered blood stains were obliterated by the fire and cleaning. From one of the front seats about a third of the upholstery had been removed. An examination shows a clean, straight cut apparently made with a knife or pair of scissors.

In spite of fire and water, spots of human blood were found on the underneath part of one front seat, on the rear part of the other, and on the metal on the bottom of the right front door.

Prior to his arrest Cloutier had ample time to change and to clean the clothes which he wore Tuesday morning. His own statement of what he wore that morning does not agree with the testi-

mony of the witnesses for the State. In any event, neither the clothing which they said he wore, nor that which he said he had on, was produced at the trial.

All those who saw him early Tuesday morning agree that there was nothing unusual at that time about his appearance, unless it was that he was unusually neatly attired. There was no mark on his face, nothing in fact to attract attention. But, at the time of the fire, he had a fresh scar on his nose. That was received sometime between half past nine Tuesday morning and noon. It was seen by McLeod at the time of the fire; it was there when he was arrested on Wednesday. The officers who arrested him testify that they also found scratches on his neck, on his right ear, on his left shoulder, and on his arms. Significant, indeed, were these latter which he did not even attempt to explain. Some comment he evidently thought was necessary with respect to the mark on his nose. Wednesday, when he was arrested, he was not accused of murder. There was no apparent connection between the scar and a missing girl. What purpose was there in prevaricating? Yet, when asked by the officers how he received the injury, he said first that a piece of wood flew off the saw at the mill and hit him Tuesday. When one of the officers commented on the freshness of the scar, he said that the same thing happened again Wednesday. He later told them that while walking in the yard he stepped on the end of a stick which flew up and hit him in the nose. At another time he said that he got it while putting out the fire, and this was the story which he decided to stick to on the witness stand.

Those marks and that scar were by themselves some evidence that he had had a struggle with some one that morning. How he received them was open to explanation by him. When he failed to account for the scratches on his face, his neck and his arms, and gave an obviously untrue account of how he received the scar on his nose, their importance is magnified many times.

Such, in substance, is the case built up about this man. The defense failed to establish a satisfactory alibi. After his father, brothers and friends had finished their testimony, the jury were undoubtedly satisfied that he met Florence Grenier at half past nine in the morning, and that thereafter until sometime after noon, he was not

seen again. If Jones saw him, where was he at the trial? If Cloutier was about the mill all the morning, why is it that only his father and his brother testify to his being there? His alleged trip to inspect the steam engine seems to have been without purpose, and no one was found who could corroborate his testimony on this point. His movements to half past nine are fully accounted for; thereafter, for at least three hours, he drops from sight.

The validity of this conviction depends on circumstantial evidence. It is not for that reason any less conclusive. Crimes of violence are not usually committed in the sight of men, and most murderers will go unpunished if resort can not be had to collateral facts, from which the inference of guilt arises. The advances of science have furnished to the culprit additional means to escape detection; they are not denied to the state in the effort to suppress crime. The criticism of circumstantial evidence usually comes from those who view each separate circumstance by itself rather than in its relation to the others, from those who fail to see the whole pattern into which each separate incident so neatly fits. When many circumstances, having their origins in unrelated sources and established by the testimony of impartial witnesses, all point in one direction, their force is often compelling, the inference to be drawn from them irresistible. In *Commonwealth* v. *Webster*, 5 Cush., 295, 311, Chief Justice Shaw in his discussion of circumstantial evidence cites with approval the following language from East's Pleas of the Crown: "Perhaps strong circumstantial evidence, in cases of crimes like this, committed for the most part in secret, is the most satisfactory of any from whence to draw the conclusion of guilt; for men may be seduced to perjury by many base motives, to which the secret nature of the offence may sometimes afford a temptation; but it can scarcely happen that many circumstances, especially if they be such over which the accuser could have no control, forming together the links of a transaction, should all unfortunately concur to fix the presumption of guilt on an individual, and yet such a conclusion be erroneous."

And so in this instance the State has proved that this girl was last seen alive as she was about to enter an automobile with this respondent; that she was murdered, and her body left at a lonely

place about six miles away; that the respondent's whereabouts that morning after half past nine were unaccounted for; that under her head was a sofa cushion similar in all respects to one that had been seen in the respondent's car that morning and at other times in his home; that a mysterious fire occurred in his car; that the cushions from the back seat were missing, and part of the upholstery on the front seat cut off; that, in spite of the fire within the car and the cleaning of it, spots of human blood afterwards were found in it; that the respondent, sometime during the morning of the girl's disappearance, received scratches on his face, neck and arms, and a scar on his nose; that his conduct strongly pointed to guilty knowledge of the girl's disappearance, in that when taken into custody he denied knowing her, when in fact she was a close friend; in that he said, "I will die before I talk," and at another time, "I will tell all"; that he failed to account for his whereabouts on the morning that she disappeared; that he gave a false explanation of how he received the scar on his nose.

Neither all, nor indeed any substantial part of these circumstances, could concur and leave any reasonable doubt in the minds of an impartial jury of the respondent's guilt. The verdict was fully justified. The motion for a new trial was properly denied.

## THE EXCEPTIONS

In considering the exceptions it must at all times be borne in mind that the rule is now well established in this jurisdiction that mere technical error will not justify a new trial. There must be substantial prejudice. A just verdict will not be lightly set aside. *State* v. *Priest,* 117 Me., 223, 103 A., 359.

The respondent objected to the admission in evidence of Exhibits 3 and 4, two pieces of wood found under the body. The objection to these is based on the fact that they were in no way connected with the commission of crime. If such is the case, and they were merely a part of the debris that littered the dump where the body was placed, and like the ground stained with the blood of the victim, it is hard to see how the respondent was in any way prejudiced by their admission.

The respondent objected to the admission of Exhibits 6, 7, the front seats of the automobile used by the respondent, Exhibit 8,

the door, and Exhibit 13, the car itself. All of these were relevant and properly admitted.

Exhibits 9, 10 and 11 were different articles of clothing worn by the victim. Counsel contend that their admission in evidence was solely for the purpose of arousing prejudice against the accused. Such is not the fact. On cross-examination, counsel for the defense sought to prove by Dr. Love that the girl might have met her death by jumping or falling from a moving automobile. The witness suggested that, if such had been the case, the clothing would have been torn. The clothing was properly exhibited to the jury on this issue. That it was not torn was cogent evidence to refute such claim.

During the cross-examination of Mederic Cloutier, he was asked whether he had a license to drive a car. The respondent objected to the evidence on the ground that the witness could not be impeached in this manner. Conceding the soundness of this contention, the question was not asked for such purpose. The prosecutor was endeavoring to show that the witness disposed of the cushions by taking them somewhere in the car. The witness claimed that he walked and had never driven his father's car. In an endeavor to break down this testimony, he was asked if he didn't have a license to drive. His negative answer was certainly not prejudicial. He neither drove, nor had a license to drive. In any event, this particular inquiry was of trifling moment and the admission of the evidence would by no means justify the granting of a new trial.

The next exception relates to the exclusion of evidence that the respondent was taken to the morgue, shown the girl's body, and questioned there. Such evidence was properly excluded. Had statements of the respondent made under such conditions been offered against him, the objection might have had some force. The only admissions, however, which tended to incriminate him were made to the police prior to the time when the body was discovered, and to such statements there was no objection offered. By no possibility could the fact that he was subsequently questioned at the morgue after the body was discovered have any relevancy.

One Sam Jutras, a resident of Claremont, New Hampshire, was called as a witness by the defense to testify as to the good character of the respondent while living at Claremont. The Cloutier family had moved from Claremont to Biddeford two years before. The

witness testified that he knew nothing about Cloutier's reputation in Biddeford. The Court ruled that the evidence was inadmissible because the inquiry could be only as to his reputation in Biddeford where he was then living. The defense noted an exception. If he had lived in Biddeford a sufficiently long time to have acquired a reputation there, such ruling was correct. The Court had a discretion in determining this preliminary question, and in the absence of strong evidence showing the ruling is wrong, we can not hold that such discretion was abused.

The next exception relates to the admission of the testimony given by certain defense witnesses at the coroner's inquest. It was offered to show inconsistencies with their testimony at the trial. The exception is not seriously pressed. The testimony was clearly admissible for this purpose.

The last exception was to the refusal of the presiding Justice to give certain requested instructions relating to circumstantial evidence. These were seven in number. The Court gave the first exactly as requested. It was as follows:

"I. Before you are justified in finding the respondent guilty on circumstantial evidence, the State must prove every circumstance upon which a conviction must rest 'beyond a reasonable doubt' and the evidence must also be sufficient to exclude 'beyond a reasonable doubt' every other reasonable hypothesis except that of the respondent's guilt, and if the evidence of the State fails to do this, the respondent is entitled to a verdict of not guilty."

This stated the law clearly, correctly, and adequately. The other six were hardly more than variations in phrasing of the one given, and, the subject having been adequately covered, they were properly refused.

Counsel complain of the remarks of the presiding Justice in explaining this instruction. These are as follows:

"That means, Mr. Foreman and Members of the Panel, what I tried to explain to you and thought I had. I read that because I thought I might have omitted something. The circumstances upon which the State relies must, of course, prove

—must point to—all of them, all of those that are necessary to show the crime, must point to—the defendant's guilt. If they do not point to the defendant's guilt or if they point to the guilt of some other party, then the respondent is not guilty. I tried to say that in my main charge, but I read and give you the requested charge in addition to what I have said about it."

It is said that from this the jury would have been warranted in convicting the respondent if the circumstances merely pointed to the defendant's guilt. Taking the charge as a whole, and the instruction as given, this would be a very strained interpretation. Reading the whole charge, what the Judge really says is that all of the necessary circumstances must point to the defendant's guilt and to that of no one else. In addition, they must be proved beyond a reasonable doubt, and every other reasonable hypothesis than that of guilt must be excluded beyond a reasonable doubt. We do not see how there could have been any possible misunderstanding in the minds of the jury.

In any event, if counsel had thought otherwise, the remedy was to have called the matter to the attention of the Court and to have excepted to the explanatory remarks as made.

We find no substantial error in the conduct of the trial. The rights of the respondent seem to have been safeguarded throughout, both by his counsel and by the Court. The verdict was warranted by the evidence. Justice would not have been satisfied by any other result.

> *Exceptions overruled.*
> *Appeal dismissed.*
> *Judgment for the State.*
> *Case remanded to the Superior Court for sentence of the respondent.*