STATE OF MAINE *vs*. REUBEN S. BREWER.

Lincoln.     Opinion, July 31, 1937.

*Clyde R. Chapman,* Attorney General,
*Weston M. Hilton,* County Attorney for State.
*Burleigh Martin,*
*Frank A. Tirrell, Jr.,* for respondent.

SITTING: DUNN, C. J., STURGIS, BARNES, THAXTER, HUDSON, MAN-SER, JJ.

BARNES, J.   At the May Term, 1936, of Lincoln County, the respondent was indicted for murder, tried and convicted of that crime.

After verdict and before judgment he presented to the Justice presiding a motion to set aside the verdict and grant a new trial.

On denial of the motion, he took an appeal to the Law Court, as provided by R. S., Chap. 146, Sec. 27.

On such appeal the question is whether, in view of all the evidence in the case, the jury was warranted in believing beyond a reasonable doubt, and therefore in finding, that the defendant was guilty of

the crime charged against him. *State* v. *Lambert*, 97 Me., 51, 53 A., 879.

Reuben S. Brewer, forty-five years of age, by occupation a lobster fisherman, had lived with his wife, Dolda M. Brewer, on the shore, at Ocean Point, in Boothbay, except for some times in the winter, for six or eight years, until her death on April 18, or 19, 1936. They had no children.

Property which he occupied at Ocean Point, consisted of a four-room house on one of the main roads leading to the shore, a garage nearby, and a wharf, upon which, at the shore end, stood a covered fish shed and a store. There were several cottages on the Point, two between the Brewer house and wharf, but none were occupied at the time of Mrs. Brewer's death, except two, and these were 600 and 1000 feet distant respectively, and neither could be seen from house or wharf.

It appears that the last person who saw Mrs. Brewer alive, other than her husband, was Mr. Risser, a life insurance agent. He fixes the time as about half past eleven in the forenoon of Saturday, April 18, 1936, when he and Brewer were drinking, at the Brewer home. He says further that he stayed there not over five minutes. Thus it appears that Mrs. Brewer was alive, with "nothing unusual" in her appearance, twenty-four hours before Dr. George A. Gregory, the medical examiner, took charge of her dead body.

Sheriff Greenleaf testified that next morning, at about eight o'clock, at his home in Boothbay Harbor, four and one-half to five miles distant, he was "called up" by Brewer and asked to "come over"; that after breakfast he drove to the Brewer place and found Brewer near his garage, at about a quarter past nine.

Up to this time the sheriff states that he did not know for what reason Brewer had called him.

He testified that Brewer told him his wife had disappeared again, and said, "come down here I want to show you something"; that he followed Brewer into the store, and there saw a woman's coat, which Brewer told him was his wife's coat, found by him on the rail of the fish shed and placed in the store, and that Brewer said he "thought it was funny"; that he, the sheriff, walked out toward the end of the wharf, searching sea and shore and seeing nothing of interest, and then followed Brewer, at his request, to his house.

In the front room, on the ground floor, there was a stairway leading to the upper floor, at the foot of the stairs a couch, on which Brewer told the sheriff that he slept.

The two men went up the stairs and into Mrs. Brewer's room in the rear end, where they found a bed, a "stand" next the bed and a commode by the stand.

The sheriff continued — "he pointed to a night dress, brand new, I should say it never had been used, laying on the foot of the bed. He called my attention to that. I says, 'is there any note or anything around?' He says, 'I haven't seen any.' I had no more than got the words out of my mouth when I discovered the note under the alarm clock next to the head of the bed. I picked it up, and read some of it; and handed it to Reuben. He says, 'that answers the story.'"

They went down on the wharf again and looked around the shore, and the sheriff drove home to get grapples, but as he drove into his yard he learned that Brewer had called again, and he immediately returned to a point in the road near the store, from which he could see the body of Mrs. Brewer, some thirty feet or more northerly of the wharf or fish shed.

He took charge of the situation, calling the medical examiner, and an undertaker. The doctor arrived at about eleven o'clock, went directly to the body as it lay some thirty or more feet north of the wharf, perhaps ten feet from high-water mark. It lay, face down, with head toward the south and the shore, "as in a sort of cradle" between two rocks.

The shore at this point was a great ledge, almost smooth of surface, but sloping gently into the bay, and strewn with rocks and stones at the location of the body.

When first discovered the body lay eight or nine feet above the reach of the tide, and in plain view from the road along shore continuously for several rods back toward the Brewer house, and directly opposite the end of a path leading thence through bushes and small trees to the rear end of the Brewer house.

The doctor testified;—"her hair was over the front of her head, it was bobbed, and it was hanging down over the front of her head. That hair was pretty wet, but apparently near the scalp it didn't seem to be as wet." She was fully clothed, with a dark coat, sweater

and scarf, slacks, bloomers, overshoes, shoes, stockings, and gloves, the last not buttoned.

When the body was turned over, the doctor found "a very noticeable and marked discolored area around the eye on the left side . . . and an incised wound over the outer angle of the right eye (a cut in the tissue)." Rigor mortis was then breaking down.

It was the doctor's opinion that the woman had been dead from twelve to eighteen hours before he first saw her body.

He had the body taken to undertaking rooms and there performed an autopsy.

He found no marks of violence other than on the face. There were lacerations — "the lower lip on the right was cut on the inside of the mucous surface, swollen and discolored and also on the other side, but not cut. The upper lip was swollen, not cut, bruised and swollen. The nose was swollen, but not discolored. On the left upper eye-lid, extending from the nose out, it was very dark, ordinarily called a black eye. There was a cut on this left side, beginning at the brow, and going up over the forehead of about four and a half inches by probably I think three and a half inches . . . there was a swollen and a very contused wound."

The autopsy revealed no water in the lungs or bronchial tubes.

The doctor concluded that death was caused by blows on the head, and "very likely" the body was erect when the blow was received.

He found "very congested tissue" in the brain, evidence of concussion of the brain.

About a month later a second autopsy was performed by a pathologist, of this state, who was assisted by Dr. Gregory and by an eminent expert in criminal investigation, called as a witness by the defense.

These three agree that the blows that left the bruises on the head were received before death; that the death was due to the stopping of breathing before the heart had stopped its action, a result of blows on the head, and was not caused by drowning.

A not less important fact is agreed upon by the medical witnesses. It is that lividity, a discoloration of the tissues beneath the skin, was most noticeable on the back of the body, and was caused by the settling of blood in the back of the victim while the body lay on its

back for a time, after death. Thus it would appear that the body, for a time long enough to establish lividity, lay in the house or in some hiding place, and was later placed in the water or on the ledge.

Two men, Pinkham, a fisherman who beached his boat south of the wharf, sold respondent a keg of lobsters, was told that the wife was missing, and Woodward, driving up the road for a load of sea weed, were on the Brewer premises, Sunday morning, before the sheriff arrived. These men were served with drinks, but neither was inside the Brewer house.

Neither saw the body.

It is in evidence, and uncontradicted, that in September, 1935, Mrs. Brewer left her home and remained away from it for a time, securing a deputy sheriff to accompany her from the Burnham hotel to her home that she might get needed clothing.

Cottagers and their guests testified that in the summer and in September of 1935, upon different occasions, and in the presence of Mrs. Brewer's friends, her husband called her the vilest and most repulsive names; that in one instance he pushed her downward on a stairway, when a man caught her and saved her from falling; that once he threw a pair of shears at her.

The State charges that Brewer killed his wife, and at some time before the body was found he threw it into the bay or on the shore where the sheriff found it.

The testimony is, in the main, circumstantial.

The defense is suicide by drowning.

The coat, described as a light coat with fur collar, and the hanger still in it, found in the fish shed, probably did not seem to have been carried there by a woman bent on drowning herself, since the body was found clothed in a heavy coat, called chinchilla.

The testimony of respondent as to what he did on Saturday afternoon is suggestive of his guilt. He testified that after working in his garage till half past five or six o'clock that afternoon he went to the house; that his wife was not in the lower rooms; that he went upstairs, to the door of her room and saw her lying on her bed, fully clothed, with no covering over her, "but her face nearly covered"; that he did not speak to her, though she "had been complaining for two or three days."

Thereupon he went to the Grey store, where for perhaps two

hours of Saturday afternoon he remained, purchased a can of coffee and four lamb chops, and returned home.

Mr. Grey testified — "Mr. Brewer came in and bought a pound of coffee of my clerk, we asked·Mr. Brewer if we should call Dolda. And he says, 'has she called?' And I told him, 'no.' He says, if she had not called 'I guess there is not anything she wants.' And a little later, personally, I said to him, 'You better let us call Dolda, or you'll be out of luck, for it is a double holiday.' He said, 'if she has not called, why I guess there is nothing she wants.'"

After remaining at the store until about seven P.M. respondent testified that he returned home, did not see his wife, did not speak to her nor go upstairs, but ate a lunch and lay down on the couch, dressed, except for coat or sweater, shoes or rubbers.

He said he was partly wakened "around one o'clock" by a noise that he thought next day sounded like a scream; that he slept again, until roused by the car of a party who came and purchased liquor; that he slept again until five, when he rose, got his breakfast and went to his garage, without seeing his wife or speaking to her.

He said that when Mr. Pinkham landed by the wharf, he went down, at Pinkham's request returned to the store, and, when standing with Pinkham, saw a truck stop at the house; that he went up and treated Woodward, and returned to Pinkham. He stated it was at this time he found the coat in the fish shed and talked of it and his wife's disappearance, that he next went to the house, to his wife's room, searched for her through the house, garage, the Holway cottage, ·of which he had the keys, the Hussey log cabin, returned and called the sheriff.

He said that it was "at least half an hour" before the sheriff came; that together they inspected wharf, store, and shore, and while the sheriff was away he stayed in the house, "about a minute"; went to the store, "out to the door, and went about half by the door and looked over the north rail; and I was looking at her body right head to me."

Then he testified that he went back to the house, "called the sheriff and told him to come over and bring the undertaker"; that the sheriff was gone only fifteen or twenty minutes, and that during that time "a car drove up there, and I was going to stay up to the house and wait for him (the sheriff); but I went down, I didn't

know but those people in the car might go down and see the body, you know, and I went down and watched the body until they left."

It seems there is sufficient evidence to convince a jury that Reuben Brewer killed his wife, before visiting the Grey store on Saturday evening, and afterward threw her body into the water or placed it about where it was found.

They heard a particular description of the path, leading through "green growth" from the rear of the Brewer house, behind unoccupied cottages to the road, just opposite the spot where the body was found. If they decided that respondent alone had opportunity to commit the murder, there seems abundant proof to justify such conclusion.

The respondent contends that he has no knowledge of how or when his wife came to her death; that the note found by the sheriff was written by her, and proves her intent to commit suicide.

The note is State's Exhibit One, claimed by the State to be a forgery, written by Brewer, and placed by him on the stand where it would be promptly discovered, upon investigation.

There is testimony of experts in handwriting that the note is in Brewer's writing, and that it is the writing of his wife. The jury had standards of the writing of each, a copy of the questioned note, written by Mr. Brewer, at the sheriff's request, a letter in Mrs. Brewer's hand, whereon, between the original lines, copies of words she had written appear, which the State suggests were written by Mr. Brewer in preparation for imitation of her hand.

The various exhibits have been studied with great care; and if the jury came beyond reasonable doubt to the conclusion that the note was forged by the respondent, we can not say their finding is wrong. In fact the note seems to the Court the work of Brewer's brain and hand.

Although motive does not have to be proved, the jury may have found in the testimony of the respondent, who seems to have withdrawn from natural domestic life, a complete aversion for his wife.

They heard testimony of insurance on her life, Reuben Brewer beneficiary, and of his statement on Sunday afternoon, April 19, that he had employed a lawyer to probate her estate. They heard the respondent testify that although he was not arrested for at least three weeks after the finding of the body, yet he thought when

testifying that it was on Monday the twentieth that he called counsel and was advised not to talk with "anyone unless with the officers." They also heard the sheriff testify that on the afternoon of the nineteenth, on Sunday, Mr. Brewer told him, in the presence of Dr. Gregory and the County Attorney, that he had been advised by his attorney not to talk.

The jury may well have concluded that, after her death, Mrs. Brewer's body was secluded somewhere about the premises, reclining face upward, as they might well believe from Dr. Gregory's testimony that when he inspected the body, on the ledge, her arms were "upward like that (indicating), the hands were partly closed and about that position, outward flexed on the arms."

As to all questions of fact it is the province of jurors to decide.

All of the evidence was theirs to study, and we can not say they should not have been satisfied beyond reasonable doubt that murder was committed, and by Reuben S. Brewer.

*Appeal denied.*
*Judgment on the verdict.*