STATE OF MAINE *vs.* HOWARD MERRY.

Hancock.    Opinion, August 29, 1939.

*Franz U. Burkett,* Attorney General,
*William B. Blaisdell,* Assistant Attorney General,
*Norman Shaw,* County Attorney, for State.
*William S. Silsby,*
*Hodgdon C. Buzzell,* for respondent.

SITTING: DUNN, C. J., STURGIS, BARNES, THAXTER, HUDSON, MAN-SER, JJ.

Dunn, C. J. No one doubts that Frank Crowhurst was murdered. His dead body was found on Monday morning, July 25, 1938, on the floor of a small building in Gouldsboro, which he had used as a wayside place and filling station, as well as for his living quarters. The county medical examiner testified that his examination of the body disclosed wounds on the man's head, one penetrating the skull, and multiple lacerations; all the wounds could have been inflicted by an instrument with a rounded head, such as a hammer or a socket wrench. He stated it as his opinion that there were eight blows, possibly more, one or all causing violent death.

Howard Merry (respondent below, appellant here, the designations interchangeable,) was suspected of the deed. He was indicted for murder.

In this State, degrees of murder have been abolished. The crime is now defined by statute as the unlawful killing of a human being, with malice aforethought, either expressed or implied. R. S., Chap. 129, Sec. 1.

Put upon his trial, before a jury, at the September Term, 1938, of the Superior Court for the County of Hancock, the respondent was found guilty of murder. He filed, to the trial court justice presiding at the term, a motion for a new trial, on the grounds that the verdict was against the evidence, and the weight of the evidence, and hence against the law. The motion was rejected.

The case is brought up, both on appeal from the rejection of the new trial motion, and on a bill of exceptions.

Save one, the exceptions are not pressed, and seem to be waived. Counsel recognize that discussion, initially, in their reply brief, of the one exception, is out of order. Nevertheless, argument in support thereof is that when, at the trial of a criminal case, a witness for the prosecution testifies as to statements of the accused, tending to show that he is guilty, the rule as to the non-permissibility of self-serving statements does not preclude eliciting, on cross-examination of the witness, the whole of the subject matter, even though statements so drawn out are favorable to him. *Com.* v. *Britland* (Mass.) 15 N. E. (2nd), 657.

No exception taken below directs attention to any ruling which precluded the respondent from eliciting any statement which he might have made to the testifying witness. The exception reserved

goes to a ruling sustaining objection to this question, propounded on cross-examination, to Sheriff Hodgkins:

"Did you ask him (respondent) to do anything at that time, or suggest his doing anything?"

What the witness, had he been allowed to answer, would have replied, is not shown.

Viewed from any angle, the exception is without legal merit.

This appeal from a conviction of homicide brings up for review only the record in this case, the record, in this sense, being inclusive of the stenographic transcript of the testimony upon which the conviction is based.

The proposition of the defense on the appeal is that on the evidence in entirety, the fact as to who committed the crime is in reasonable doubt.

The State contends the proof to establish that the respondent perpetrated the murder, actuated by malice as well as motive.

The evidence is, in part, circumstantial.

A conviction may rest on circumstantial evidence. This is too well established to require discussion. *State* v. *Lambert*, 97 Me., 51, 53 A., 879; *State* v. *Terrio*, 98 Me., 17, 56 A., 217; *State* v. *O'Donnell*, 131 Me., 294, 161 A., 802; *State* v. *Cloutier*, 134 Me., 269, 186 A., 604; *State* v. *Brewer*, 135 Me., 208, 193 A., 834.

To justify a conviction on circumstantial evidence, the circumstances relied on must not only be consistent with, and point to the prisoner's guilt, but must be inconsistent with any other rational hypothesis. 20 Am. Jur., Sec. 1217; *Com.* v. *Webster*, 5 Cush., 295; *State* v. *Lambert*, supra; *State* v. *Terrio*, supra; *State* v. *O'Donnell*, supra; *State* v. *Cloutier*, supra; *State* v. *Brewer*, supra.

To be useful in evidence, a fact must be proved to be true. In the courtroom, facts are proved by the testimony of witnesses.

It is elementary, in a criminal case, that it is the province of the jury to settle the facts, and determine the reasonable inferences to be drawn therefrom. *Warner* v. *State*, (Ind.) 175 N. E., 661, 74 A. L.R., 1357. The jurors are the ultimate, rightful and paramount judges of the facts. *State* v. *Wright*, 53 Me., 328.

It may be noticed here, quite as well as anywhere, perhaps, that, in murder, malice aforethought must exist, and, as any other elemental fact, be established, not beyond all possible doubt, but be-

yond a reasonable doubt; malice is not limited to hatred, ill will or malevolence toward the individual slain; it includes that general malignancy and disregard of human life which proceed from a heart void of social duty, and fatally bent on mischief. *Com.* v. *Webster*, supra.

Malice aforethought may be expressed or implied. 4 Bl. Com., page 198. It is express when the wrongful act is done with a sedate and deliberate mind and formed design. It is implied when there is no showing of actual intent to kill, but death is caused by acts which the law regards as manifesting such an abandoned state of mind as to be equivalent to a purpose to murder. Malice includes intent and will. *State* v. *Robbins*, 66 Me., 324, 328.

A wrongful act, known to be such, and intentionally done, without just cause or excuse, constitutes malice in law. *True* v. *Plumley*, 36 Me., 466, 484; *State* v. *Knight*, 43 Me., 11, 137; *State* v. *Albanes*, 109 Me., 199, 83 A., 548.

Malice aforethought implies premeditation. 38 L. R. A. (n.s.) page 1055, note.

"Under the statute, there must be not only an intention to kill, but there must also be a deliberate and premeditated design to kill. Such design must precede the killing by some appreciable space of time. But the time need not be long. It must be sufficient for some reflection and consideration upon the matter, for choice to kill or not to kill, and for the formation of a definite purpose to kill. And when the time is sufficient for this, it matters not how brief it is. The human mind acts with celerity which it is sometimes impossible to measure, and whether a deliberate and premeditated design to kill was formed must be determined from all the circumstances of the case." Earl, J., in *People* v. *Majone*, 91 N. Y., 211.

On a prosecution for murder, motive — that is, the cause or reason that induced commission of the crime — is not an essential element. *State* v. *Ward*, 119 Me., 482, 111 A., 805; *State* v. *Brewer*, supra. All the acts of men cannot be explained. However, evidence of motive is admissible for the purpose of furnishing evidence tending to prove guilt, which, in connection with the whole evidence, the jury must consider. Michie, Homicide, Vol. 1, page 708.

Intent, and not motive, governs. Therefore, a conviction for murder may be had, where, without reference to the motive which prompted it, there was an intention to do the criminal act. *State* v. *Jaggers*, 71 N. J. L., 281, 58 A., 1014: *People* v. *Hegeman*, 107 N. Y. S., 261. Sane men are regarded as acting from motive. *State* v. *Neal*, 37 Me., 468, 470; *State* v. *Gilman*, 69 Me., 163.

There was testimony, at the trial, by at least four State witnesses, that on Sunday, July 24, between two o'clock in the afternoon and about seven in the evening, Mr. Crowhurst was seen, alive and well, in and about his place of business; still others, some of them called by the State, and some by the defense, place him there later than that.

Irving Hinckley, who, on the morning of July 25, found Crowhurst's dead body, had come to the station, accompanied by his wife, to buy gasoline. The time, on his estimate, was between eight and nine o'clock. No person, so he said while on the stand, was in sight; blowing of his automobile horn provoked no response; his halloos went unanswered. Witness thereupon entered the building through the usual door, which was closed, but unlocked; he found the shades drawn, and no lights burning; the corpse, which he recognized as that of the man he had known as Mr. Crowhurst, was on the floor, in the entrance of a small door leading behind a bar.

Not only was there blood, a large pool, in the manner of description of this and other witnesses, on the floor, where the man had been felled or overpowered, but there were blood spots on the surrounding walls, five feet, even higher, from the floor. In the victim's clenched fist was some grayish hair, later determined, on test, so a witness for the State testified, to be the dead man's own.

Irving Hinckley's testimony affords room for legally valid inference that, although he looked to see what, in the building, might be seen, he saw there no signs of a scuffle, of ransacking, or of theft. Other witnesses for the prosecution testify in the same tenor.

For the defense, two witnesses suggest the motive of thievery. Of this, more presently.

Evidence introduced by the State is that there was money in the dead man's clothing, rings on his fingers, and a watch in his pocket; a cash register and its contents were apparently intact; a trunk where, in his lifetime, the decedent was accustomed to keep money,

and in which, on the lock being pried and the trunk opened, money was found, was, for anything tending to indicate otherwise, in its usual position, and in nowise disturbed.

Stress is placed by the defense on the fact that the trunk key never has been produced; and on the testimony of Mrs. Evelyn Lawrence, that, to her knowledge, Mr. Crowhurst had, one day two months preceding his death, and in connection with a business transaction to which the witness had been party, made use of a billfold, in which he had money and a checkbook. John Lawrence, husband of the woman, who preceded him on the stand, gave testimony that he had, on several occasions, seen Crowhurst have a pocketbook.

No other witness alludes to the billfold, affirmatively; some say, negatively, that Crowhurst was not known to them to possess anything of the sort. No case for the carrying of money or papers was introduced into the evidence.

Irving Hinckley, to recur again to his testimony, went for help; officers were notified.

The sheriff, a deputy, the medical examiner, and later a police officer from the State force, arrived at the place.

The sheriff and examiner, who came at 9:45 A. M., testify in substantial similarity regarding the condition of the building, and the body of the murder victim.

The examiner, whose testimony has already been adverted to, when questioned further, answered that he examined the body, that "of a man lying crouched, with his legs drawn up, his left arm extended outward . . . , his right arm underneath his body, lying in a pool, a large pool of blood . . ."

In the examiner's opinion, death had occurred about twelve hours earlier.

There is testimony that, on the evening of the 24th of July, John and Vida Young, husband and wife, a small child of theirs, and Howard Merry (the latter respondent) arrived, in the Merry automobile, at five or ten minutes before eight o'clock, at the Crowhurst filling station. The Youngs, witnessing, both state that their stay was a brief one; that the respondent took them to their home, which, in the course of fifteen minutes, he left, driving back in the westerly direction from which he, and they, had come.

Other witnesses testify to the identity of an automobile, which they saw in front of Crowhurst's, both at 7:50 and at 8:30 o'clock that evening; at the earlier time, the car is described as heading east; one witness attests that he saw Mrs. Young in the car; on the latest occasion, the vehicle, so is testimony, was headed west; it was parked, unattended, unlighted. These witnesses, four in number, say the automobile was respondent's.

Investigating officers interviewed Merry, first at his sister's home in Franklin, where he lived, and later in Ellsworth, where he worked in a garage.

From the Crowhurst filling station to that part of the town of Franklin where respondent's sister's house is, was, over the road, by the shortest route fifteen and five tenths miles; otherwise it was, one way, nineteen and eight tenths miles, and another, twenty-two and eight tenths miles.

An investigating officer, Lawrence Upton, when examined as a witness, quoted the respondent as having said, on interview:

That on Sunday, July 24th, he worked in the Ellsworth garage until about noon; after lunch he went to the home, in that city, of a family named Beal, where one Ada Young was employed; thence to his sister's in Franklin, where he took off his work clothes and dressed in his best outfit, this comprising a white shirt, blue serge suit, and white shoes with black leather trimmings. The officer stated that he and others were later told by respondent that these and the work clothes, some extra shirts and shoes, were his entire wardrobe.

The respondent, so the officer continued, said that from his sister's he went, in his automobile, to the home of Mr. and Mrs. John Young, one half mile east of the Crowhurst station. He had supper with the Youngs, after which, accompanied by them and a small daughter of theirs, he proceeded in his car to Ellsworth, and back to the Beal home, where the Youngs called to see Ada, their daughter. The respondent, as his statements are testified to, did not go into the house, but remained in the car; Ada came out with her mother, and there was a brief conversation at the automobile; then they left. After a short stop or two in the city, they started away about seven o'clock; they drove to Crowhurst's filling station, ar-

riving a little before eight o'clock. The Youngs went into the station, Merry remaining in his car.

. From Crowhurst's, (still keeping on with Upton's story of the respondent's statement,) the party went to the Young home; there respondent stayed until about 8:15; leaving, he went to North Sullivan to the house of Norman Hicks, a friend, to invite him to a motion picture theater in Ellsworth. Finding the house dark, and supposing nobody at home, he turned about and started once more toward Ellsworth; the time was now around 8:45 P. M. Appreciating the need for changing his underclothes, which he had not done, respondent went back to his sister's; she had callers; he went to his room, partially undressed, then put on his work clothes and came down stairs; he lunched and helped his sister wash and put away dishes.

Time recitals are mere estimates; besides, here, as elsewhere in the testimony, witnesses are indefinite as to whether reference is to Eastern Standard Time or otherwise; it is common knowledge that, in some towns, daylight saving, one hour faster than official time, is, during the summer season, the system of measurement of time.

To pass, for the present, from what the officer testified was stated by the respondent.

Merry, twenty-eight years of age, was devoted to Ada Young; between them there had been, until the day of the murder, engagement to marry. It is in evidence that the deceased (a man seemingly beyond middle age,) was an obstacle to such devotion. He objected, while Ada was in his employ as a waitress, as she had been during that year, from early June until about July 4th, to respondent's coming to the filling station, and to his waiting, at night, in the yard, for her to be through work.

There is testimony, too, of an altercation, on Saturday night, July 23, at a dance, between the lovers, and, on the following day, (that in the night of which was the homicide,) of the giving back, by Ada, of the ring the respondent had given her. There is also testimony that Merry had learned that she (Ada) was resuming work at the Crowhurst station, and that he said he did not want her to, not considering the place a suitable one for her.

Neither Ada Young, nor any of the four callers at the home of Mrs. Jellison, (appellant's sister,) who were testified to have been

there when appellant arrived home, but who, it is in evidence, had gone when he came back downstairs, were called at the trial, to witness. But, let a word be added instantly: They would, for any showing here, have been summonable either by the State or by the respondent.

Officers made a second call at the Jellison home; in this instance, the respondent was not present. The record discloses inquiry, by the officers, for a pair of light trousers; these, a light brown in color, with darker brown stripes, were brought out by the Jellisons, and taken away by the officials; on a still later visit, they got the blue serge coat and white sport shoes of previous mention. There is nothing on the record to show that the blue serge pants were taken, or subjected to test.

Pathologists called to the stand gave opinion evidence, each in his turn, that, although they determined that spots found on the light trousers, on the right leg from the cuff up, and on the left leg from the knee up, were blood spots, yet, insufficiency of material debarred ascertaining the type of blood. At least two of the several spots found on the trousers, so these witnesses testified, had been sponged. The shoes appeared to have been polished since worn. The coat also had a few small spots below the pocket on the right hand side; these were determined to be blood spots.

There is no occasion for any expert evidence to show human blood spots on the respondent's clothing. There need be no better evidence on this point than the uncontroverted testimony of the investigating officer, who, on the stand, said that respondent had asked if blood had been found on his pants, and volunteered that, a couple of weeks before, he had a nosebleed, and that the spots on the pants came from that; also that the fly of his trousers had been soiled during "sexual intercourse with a girl during her menstrual period." The blood on the blue coat, he is said to have advanced, was from the nosebleed.

It might be noted here that Mrs. Vida Young, while witnessing, testified that respondent had, at her house, about two weeks previously, as the result of a playful accident, had a nosebleed.

Four witnesses for the State identify the respondent's automobile, standing, on the night of the killing, near a corner of the Crowhurst building. Some of them state that it was unoccupied;

others that its lights were not on. The witnesses are in acco͞r that the shades in the building had been drawn; some testifv ' ͏at the place was unlighted; others that lights could be seen by t͏͞e edge of the curtains. The time is put from eight o'clock on.

Evidence of identity, to abstract freely from Mr. Harris' Treatise on Identification, (section 562 *et seq.*,) although given positively and directly, is, after all, but the mere opinion of the witness, who should be required to give the facts upon which he based his statement, as the jury have a right to it to aid them in their determination of the matter in issue.

One of the modes of identifying personal property, whether in or out of court, is by appearance of the property itself, but, in this matter, as in many others, the weight of the testimony must generally depend upon the knowledge or familiarity of the witnesses with the subject upon which they speak.

To be sure, there is often a mistake, as well in the identity of personal property as in that of persons. Notwithstanding, the most accurate expression of identity of articles of a specific kind is to be found by the witness in the general appearance of the property. Two important things are to be considered: first, the witness' opportunies for observing; second, his attentiveness in observing. In these are found the sources of accurate impression. Harris, Identification, *supra.*

Of the four identifying witnesses, two, Arthur and Addie Johnson, husband and wife, had seen the car before, in the custody of its owner, whom they knew by sight. On that night, their testimony placed the car as headed west; the time, between 8:20 and 8:30. Their identifications had been verified by a subsequent inspection of the vehicle, made at the instance of the officers.

Mahlon Witham and Lulu Witham were the other witnesses who attested that the respondent's car was at the Crowhurst station. Mr. Witham, in testifying, said that as they (he and his wife) were riding by, he had it in mind to call on Crowhurst; he did not do so because someone was already there; glancing, he thought the car was Merry's. He saw it, on first going by, about 7:50 P. M., headed east; later, on the return journey to their home, the car was headed west; this around 8:30 P. M. On seeing the car again, shortly in advance of the trial, he recognized it. Mrs. Witham said she knew the

car as the one in which, on the afternoon of the night that she saw it at the station, she had, in company with Mrs. Young, ridden a short distance; she testified further that, at that time, the respondent was wearing, as she remembered, light trousers, and a dark blue coat, or sweater.

But the defense offers evidence in disproof of the statements of the government witnesses in regard to the presence of respondent's automobile at the station after he brought the Youngs there, shortly before eight o'clock. Witnesses were introduced, three in number, each of whom gave testimony as to seeing Mr. Crowhurst, alive, at his station, as late as nine o'clock that evening, as they rode by the place.

The defense endeavors to prove an alibi.

Olive and Maynard Jellison, respondent's sister and her husband, both swear that a little after nine o'clock, on the fatal night, the respondent was at their home, (where, as noticed hereinbefore, he lived,) to go to bed.

No other person testified in such behalf.

Other testimony for the defense tends to place other cars than that of the respondent in the Crowhurst yard that evening.

Evelyn Lawrence, a witness of earlier mention, testifies that she, with her husband, passed the filling station, in their car, about 8:15, on the evening of July 24th. She swears to seeing Mr. Crowhurst putting gas into a Rhode Island car, and that, fifteen minutes later, when traveling the road in the opposite direction, they met the same Rhode Island car, an old sedan of a dirty green color. Further, that after the Rhode Island car went by, they met a Chevrolet sedan, (Maine license) which slowed almost to a stop; that, as their car was slowed down, the sedan went into a driveway, turned, and followed them. She describes the driver of this car, saying he was a man between twenty-five and thirty years of age, that he had dark hair and heavy side whiskers, wore no coat, but had on a "garage" cap, with an emblem on the front. The witness is confident that, as she and her husband were returning home, and were, at 8:30 o'clock, passing Crowhurst's, there were no cars at his station, no one in sight about the place, and no lights on — "no need of any."

This is one of the witnesses who testified respecting the billfold.

The force of her testimony might, or not, have been damaged by the development, on her cross-examination, that in a signed account which, shortly after the tragedy, she gave investigating officers, she made no reference to the Chevrolet car or to its driver.

On recall to the stand, by defense counsel, the witness stated that this was because she was not aware that it would be of any bearing on the case. She also made corrections in certain of her testimony, not important to specify.

Mrs. Lawrence was corroborated, in the main, by her husband, John Lawrence, when he witnessed.

Still more witnesses, introduced by the defense, whose testimony is insisted as showing the presence at the filling station of cars, not inclusive of the respondent's, were Ethel Parker and her two sons.

Mrs. Parker, as a witness, testified that, on the particular evening, about nine o'clock, they drove by the Crowhurst place, twice, the intervening interval being short. She is definite that she saw, at the filling station, a parked automobile, — a coupe, — the lights of which were on; near the coupe were two men; one was Mr. Crowhurst, who was holding a gas hose. Witness had purposed stopping to buy cigarettes, but, Mr. Crowhurst being busy, she did not stop. Mrs. Parker testifies that on coming back, the lights in the station were out; the place was dark; no person was in sight. The coupe was still there, but unlighted; it was headed west.

Mrs. Parker's sons, Richard and Victor, aged thirty-two years and twenty-seven years, respectively, were riding with their mother. They swear to seeing Mr. Crowhurst and another man; they testify, too, respecting the car and the filling station, similarly to their mother.

Kenneth Strout and his wife, Pauline, called as witnesses by the defense, severally testify that at 10:30 P. M., the Crowhurst place was unlighted; that, on a public road, the course of which intersects that near which the filling station sets, was an automobile, its lights shining on the station; the lights went off as the witnesses' car approached.

Another witness for the defense, Byron Bunker, who passed by Crowhurst's just before nine o'clock that night, testified to seeing a car in the yard, headed west; he stated that it was a closed car, but did not otherwise describe it.

The power of the case of the prosecution does not depend entirely upon the testimony thus far outlined, and other more or less cumulative testimony as to respondent's car being at the filling station, and when it was there no longer.

The State urges that the testimony of Richard Ash, and of Warren Clark, being accepted by the jury, and believed by them, is evidence significant of the guilt of the respondent.

Richard Ash, twenty-three years old, and of two years' acquaintance with Merry, lives in Eastbrook. Questioned, he answered as follows:

"Q. Whether or not you saw Mr. Merry on the last day of July? On the 30th day of July did you see Mr. Merry?

A. I did.

Q. Where?

A. At Eastbrook; at my home.

Q. That was on Saturday?

A. Yes, sir.

Q. Did you have some conversation with him?

A. I did.

Q. Will you state what the conversation was?

A. Well, he wanted me to say that I saw him in the vicinity of Hancock between the time of half past eight and nine.

Q. On what date?

A. On the last Sunday, the Sunday before the Saturday.

Q. That was the day of the Crowhurst . . .

A. Murder, yes; the evening of that.

Q. What else did he say to you about it? Did he offer to pay you anything?

A. He did.

Q. Well, state just what he offered to do.

A. Well, he said if I would say I saw him in the vicinity of Hancock at that time he would pay me or do anything I would want him to do for me.

Q. Did he tell you where in Hancock he wanted you to see him? (Objection)

The Court:  He may be asked to state the whole conversation. State everything he said.

A. Well, he said somewhere in the vicinity of Springer's garage.

Mr. Blaisdell: And Springer's garage is how far north of the Hancock-Sullivan bridge, if you know?

A. I don't know, but it seems to me it would be about two miles and a half.

Q. Who did he want you to make that statement to?

A. He wanted me to go over to Ellsworth and tell it to Lieutenant Upton.

Q. What did you tell him?

A. I told him I didn't want to do it.

Q. Did you refuse to do it?

A. I did.

Q. Did he say anything more about the officers?
(Objection)

The Court: He may proceed and state the conversation.

A. All he said — he said the officers had been to see him about it.

Mr. Blaisdell: What else did he say in connection with it? They had been to see him about what?

A. Well, they had been talking over about him being down in the vicinity of Gouldsboro on that Sunday night.

Q. What else did he say about the officers?

A. He said they were going to see him again that Sunday night, I think, after this Saturday, the 31st day of July. They were going to talk with him about the matter of him being down there.

Q. Now will you re-state again exactly what Mr. Merry said to you about paying you for testifying?
(Objection)

The Court: Well, he may state.

A. Well, he said he would give me an amount of money, or he would do anything I wanted him to if I would say I saw him down there at that certain time, between half past eight and nine.

Q. At half past eight or nine in the evening?

A. Yes, between that time.

Q. That was on July 24th? That was the night he was referring to?

A. Yes, on Sunday.

Q. Who was with Mr. Merry when he came to your house?

A. Warren Clark."

The cross-examination brought out that, on being interviewed by the officers, the witness at first said he might have seen him (respondent) down there (Springer's garage, in Hancock). The story to the officers was later changed.

Warren Clark, also of Eastbrook, testified, in answer to questions, in this wise:

"Q. What did Mr. Merry say to you?

A. What did he say to me?

Q. Yes.

A. He didn't say anything to me, not at Ash's home.

Q. What did he say to Mr. Ash?

A. As near as I can remember — I didn't pay much attention to it, but he wanted him to testify that he saw him at somewhere between Hancock bridge and Franklin Roads, or in that vicinity, somewhere between half past eight and nine o'clock.

Q. On what night?

A. On Sunday night before this — Saturday night before that.

Q. Was Springer's garage mentioned?

A. I don't remember.

Q. Now did he want you to make any statement?

A. He did.

Q. And will you state what that conversation was?

A. He said at his home, or at mine . . .

Q. At his home and at yours both?

A. He didn't say anything to me at his home; he was talking to Dick.

Q. When you say 'his home' you mean Ash's home?

A. Yes.

Q. You went to Ash's home with Merry?

A. I did.

Q. Where did he pick you up?

A. At my home.

Q. What did he say to you at your home?

A. He came to me and he says 'Warren, the cops are after me,' or 'the State is after me,' and I asked him 'What for?' and he says 'For the murder of Crowhurst,' and I asked him if he did

it, and he said 'No,' and then he asked me if I was a friend to him, and I told him 'Yes,' and he wanted to know if I would help him out, and I told him I would do anything I could, and he asked me if I would testify or tell the sheriff, say to Sheriff Harold Hodgkins that I saw him between the Hancock-Sullivan bridge and Franklin Roads, or in that vicinity, in the vicinity of Springer's Hill, or somewhere down there.

Q. On what night?

A. On the 24th, Sunday before.

Q. Did he offer to pay you anything?

A. That I don't quite remember.

Q. Now where did he want you to go to make that statement to Mr. Hodgkins?

A. He wanted me to go to Ellsworth then, where he was working.

Q. What did you tell him?

A. I told him that I didn't feel as if . . . I told him . . . I don't remember just what I did tell him. I think I said . . .

(Objection)      (Question read)

The Court:   He may answer.

Mr. Blaisdell:   Now will you answer that question.

A. I told him that I would come over to the garage, but I didn't feel like doing it.

Q. Did he tell you when he wanted you to come to the garage?

A. He wanted me to come that Sunday afternoon.

Q. That was the . . .

A. Sunday after the Saturday night.

Q. That would be July 31st?

A. I presume so, yes.

Q. Now did you go to the gararge where he was working?

A. Not that afternoon.

Q. Did you go later on?

A. Yes, I did after I got through work.

Q. What did you tell him then?

A. I told him I didn't want to do it.

Q. And did you refuse finally to do it?

A. Yes.

Q. Were you in the vicinity of Springer's garage on the night of July 24th?

A. I was not.

Q. Did you state what time it was that Mr. Merry wanted you to place him between Hancock-Sullivan bridge and Franklin Roads, that night?

A. Well, approximately half past eight to nine o'clock."

Nothing on the record seems expressly to soften the impact of the testimony of Richard Ash and that of Warren Clark.

The defense argues that, adverse circumstances surrounding and endangering him, the respondent, though innocent, did, to escape the clutches of accusation, what, in emotion, seemed to him a prudent thing to do, namely, to seek men he believed he had passed on the road, on the evening of the day this case involves, to go to the officers and say when and where they had seen him.

That respondent thought, or had reason to believe, that he had met, or passed by, these young men, is not predicable on the printed record.

The statement testified by the police officer as made by Merry — in substance that, on leaving Young's, and before deciding to spend the night at his sister's, he was at the house of his friend, Norman Hicks, only to find the house in darkness, and its general appearance to indicate the occupants away, or in bed for the night, is at variance with the testimony of Mr. Hicks, and that of his mother; they say, each of them, that at the hour the officer testifies to as having been stated to him, their house lights were on, and remained burning, with the shades not drawn, for some time.

William A. Emery, Jr., respondent's employer, testifies to Merry coming to the garage, in Ellsworth, to pump up tires and get oil, sometime on Sunday, later than two o'clock, the hour he quitted work for the day. This witness swears that he noticed respondent was wearing his blue suit.

William M. Emery, son of the employer, testifies that he noted that on Sunday afternoon, respondent had on a blue serge coat and blue serge trousers; witness' attention was directed to the garments because he and respondent sometimes exchanged clothes.

Olive Jellison, respondent's sister, testified that, on Sunday night, about 9:15 o'clock, when her brother came home, she and her husband were entertaining callers, four in number. She says she consulted the clock because her callers were about leaving. She states that the respondent, who had on blue coat and pants, entered

the house by the front door, spoke, and went upstairs to his room. About ten minutes later, (the callers having meantime gone,) he came down, wearing his work trousers, white shirt and house slippers. He had a lunch, helped his sister wash and put away dishes, and went back up to bed. Ten minutes after, when witness herself went upstairs, her brother was apparently asleep, the door open into his room.

Maynard Jellison, husband of the preceding witness, testifying, agrees substantially with her; he is explicit that the respondent, on his arrival home, was dressed in blue pants and coat, later coming down from his room with his work pants on.

In a criminal prosecution, the law casts upon the State the burden to prove the guilt of the accused, not by a mere preponderance of the evidence, but beyond a reasonable doubt.

As the term is used in instructing juries in criminal cases, a reasonable doubt is not a vague, fanciful or speculative doubt, but a doubt arising out of the case as presented, for which some good reason may be given, and such a doubt as, in the graver transactions of life, would cause reasonable, fair-minded, honest and impartial men to hesitate and pause. 8 R. C. L., 220; *State* v. *Reed*, 62 Me., 129, 143.

If, at the trial of a case, there is a conflict in the evidence, the jury must, so far as possible, reconcile the testimony before it; if the evidence given by different witnesses presenting different states of fact, cannot be reconciled by the jury, then the triers must determine what part of the evidence is credible and worthy of belief, and determine the relative weight of testimony. *State* v. *Howard*, 117 Me., 69, 102 A., 743; *State* v. *Ward*, supra.

The record presented a fair question of fact, within the function of the jury to decide. The jury was required to settle material conflicts in the testimony; the determination of the triers of fact, as reflected in their verdict, shows that they apparently resolved such conflicts in favor of the State.

By their verdict, the jurors have declared that their contemplation, upon the whole record, of the evidence of facts and circumstances pointing to the guilt of the respondent, leaves no reasonable doubt in the mind of any member of the panel, as to the truth of the accusation contained in the indictment; and that such evi-

dence is lacking in agreement with the presumption of the respondent's innocence.

It remains for the judges of the law to announce their conclusion, that the evidence sufficiently supports the verdict.

The mandate must be:

*Exceptions overruled.*
*Appeal dismissed.*
*Motion for new trial denied.*
*Judgment for the State.*
*Case remanded for sentence.*